**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KEMPER COUNTY<br>BOARD OF EDUCATION,<br><br>Defendant. | ) | Civ. A. No. 3:66-CV-01373-CWR-FKB |

# ORDER

Before the Court is the Joint Motion and accompanying memorandum filed by Plaintiff the United States of America and Defendant Kemper County School District on December 15, 2021, seeking approval of the Board's plan to build a new elementary school and stop giving unauthorized aid to Kemper Academy, a virtually all-white school established in 1970 to undermine desegregation. *See* ECF Nos. 21 and 22; *see also* ECF No. 23. Having reviewed the Joint Motion and the full record, it is the opinion of this Court that allowing the Board to build a new elementary school and ending the Board's practice of providing aid to Kemper Academy will further the desegregation of the District's schools and eliminate the effects of the dual school system. Thus, the parties' Joint Motion should be **GRANTED**.

## I. BACKGROUND

In 1967, this Court enjoined the Board from segregating students on the basis of race, and approved its former "freedom of choice" plan. Order 1-2 (May 29, 1967). Two years later, the Fifth Circuit held that the Board's freedom of choice was not an effective desegregation remedy. *U.S. v. Hinds Cty. Sch. Bd.*, 417 F.2d 852, 854-56 (5th Cir. 1969) (*citing Green v. Cnty. Sch. Bd.*,

391 U.S. 430 (1968)). So, the Board started developing a new plan that promised to begin the desegregation process in earnest. *See* Findings of Fact and Recom'd. (Mar. 1, 1970) at 1-2.

In response to the Court of Appeals decision, however, a large number of white parents withdrew their children from the District and created a segregated academy, one of many private schools opened in that era to thwart desegregation efforts. Eleven days after the Fifth Circuit decided *United States v. Hinds County School Board*, on November 18, 1969, these parents met in the county courthouse to discuss the desegregation efforts.[1] A significant portion of the County's adult population attended; the courtroom, balcony, and downstairs lobby of the building were filled to capacity, and "[t]he determined mood of the gathering was that 'We will not submit; this will not; we will not let this happen to us.'"[2] Kemper Academy was established that night.

To secure the money needed to open the Academy, community members hosted fundraisers, including bake sales at the courthouse, sporting events, and at least one barbeque and deer hunt.[3] And the Board aided this effort. It gave Kemper Academy equipment it needed to operate, including desks, filing cabinets, books, and buses. The Board, for example, gave the Academy buses "for whatever they bid on the buses, and their bid was taken to put the buses in running condition."[4]

Kemper Academy opened just two months later, on January 19, 1970, using two existing facilities until a new building could be built. Approximately 300 students took classes in the former Cleveland Community School, which is located on Highway 16 between Philadelphia and DeKalb, and 75 students used the Porterville Community Center, located on the east side of the county. The

[1] Charles Ray Fulton, RACIAL INTEGRATION IN THE PUBLIC SCHOOL SYSTEM IN KEMPER COUNTY, MISSISSIPPI, 1954-1974 (Ph.D. diss., University of Mississippi, 1978) at 138-39 ["Kemper Diss."].

[2] *See* Kemper Diss. at 140 (citing "Kemper Academy Is Nearing Reality as a Private School," THE KEMPER COUNTY MESSENGER (Nov. 20, 1969) p. 1).

[3] *See* Kemper Diss. at 140 (citing "Kemper Academy to Open January 19," THE KEMPER COUNTY MESSENGER (Jan. 8, 1970) p. 1). It is not clear from the record where the deer hunt occurred, but the Board manages public-school trust lands (*i.e.*, "16th Section Land") that may be leased for hunting and fishing. *See* "16th Section FAQs *at* https://sos ms.gov/public-lands/16th-section-faqs#ar10.

[4] Kemper Diss. at 141 (*citing* Statement of E. G. Palmer, Superintendent of Education, Kemper County, Miss.).

daily attendance rate of white students in the District's schools plummeted by over 90 percent, with only 57 white students attending classes between January 15 and 22, 1970. *See* Findings of Fact and Recom'd. (Mar. 1, 1970) at 5 (noting that some white students enrolled in private schools and others stopped going to school altogether).

All of the students who attended Kemper Academy in 1970 were white. Today, 99 percent of the students who attend the Academy are white.[5] By contrast, the District's black enrollment – in 1970 and today – exceeds 90 percent. The Academy, from its inception, has hindered the District's ability to retain white students.

In 1968, the Board operated five schools with a total district-wide enrollment of 2,914, including two all-black schools and three virtually all-white schools.

| *Kemper County -- Student Assignment 1968* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Grade | Black | % | White | % | Other | % | Total |
| Dekalb High | 1-12 | 1 | 0.2% | 560 | 99.8% | 0 | 0.0% | 561 |
| Lynville Elem | 1-8 | 2 | 1.9% | 103 | 98.1% | 0 | 0.0% | 105 |
| Scooba Elem | 1-8 | 0 | 0.0% | 132 | 100.0% | 0 | 0.0% | 132 |
| Spencer High | 1-12 | 734 | 100.0% | 0 | 0.0% | 0 | 0.0% | 734 |
| Whisenton High | 1-12 | 1382 | 100.0% | 0 | 0.0% | 0 | 0.0% | 1382 |
| TOTAL | | *2119* | *72.7%* | *795* | *27.3%* | *0* | *0.0%* | *2914* |

The next year, after the Academy opened, the District's enrollment stabilized with a nearly 75 percent reduction in white students. The white enrollment dropped from 795 to 207 and the District became a 90 percent black school system.

| *Kemper County -- Student Assignment 1970* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Grade | Black | % | White | % | Other | % | Total |
| East Elem | 1-3 | 209 | 89.7% | 24 | 10.3% | 0 | 0.0% | 233 |
| West Elem | 1-4 | 444 | 89.9% | 50 | 10.1% | 0 | 0.0% | 494 |
| East High | 4-12 | 492 | 97.6% | 12 | 2.4% | 0 | 0.0% | 504 |
| West High | 5-12 | 723 | 85.7% | 121 | 14.3% | 0 | 0.0% | 844 |
| TOTAL | | *1868* | *90.0%* | *207* | *10.0%* | *0* | *0.0%* | *2075* |

[5] *See* Kemper Academy at https://www.privateschoolreview.com/kemper-academy-profile.

This Court pondered this precipitous change in enrollment at the time, *see* Findings of Fact and Recom'd. (Mar. 1, 1970), but the Board never succeeded in increasing white students' enrollment in its schools. In 1992, for example, the Board operated three schools with an overall white enrollment of 215 and a black enrollment of 1,473.

| *Kemper County -- Student Assignment 1992* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Grade | Black | % | White | % | Other | % | Total |
| East Elem | K-8 | 234 | 94.0% | 15 | 6.0% | 0 | 0.0% | 249 |
| West Elem | K-4 | 387 | 82.9% | 70 | 15.0% | 10 | 2.1% | 467 |
| Kemper High | 5-12 | 852 | 86.2% | 130 | 13.2% | 6 | 0.6% | 988 |
| TOTAL | | *1473* | *86.4%* | *215* | *12.6%* | *16* | *0.9%* | *1704* |

In 2018 and 2020, the Board modified its schools' grade configurations. *See* ECF Nos. 6 and 20. It now operates four schools in a linear, single-school feeder pattern. Students matriculate from Lower Elementary School (K; 1-3), located in Scooba, on the eastern side of the county, to Upper Elementary School (K; 4-6), which located in Dekalb, and then onto the Middle School and High School, which are co-located in the same facility about 1.5 miles west of Upper Elementary. The current enrollment is:

| *Kemper County -- Student Assignment 2021* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Grade | Black | % | White | % | Other | % | Total |
| Lower Elem | PK-3 | 236 | 94.4 | 11 | 4.4 | 3 | 1.2 | 250 |
| Upper Elem | PK; 4-6 | 207 | 95.8 | 8 | 3.7 | 1 | 0.5 | 216 |
| Kemper Mid | 7-8 | 179 | 96.2 | 4 | 2.2 | 3 | 1.6 | 186 |
| Kemper High | 9-12 | 271 | 97.5 | 7 | 2.5 | 0 | 0.0 | 278 |
| TOTAL | | *893* | *96.0* | *30* | *3.2* | *7* | *0.8* | *930* |

On August 5, 2021, the citizens of Kemper County approved a $12 million bond issue to build a new elementary school. Construction of the new facility is part of a multi-phase consolidation plan. The new building is expected to be more efficient and cost-effective than the existing facility, and the District plans to use those savings, in part, to expand the new facility over

time. The Board's long-term goal is to centrally locate all of the District's elementary students in the new school and close the Lower Elementary School facility.

In addition to the existing secondary facility and the proposed new elementary school, the Board also owns and operates the John C. Stennis Vocational Complex in Dekalb. The District used this facility to teach various career and technical ("CATE") classes, such as law and public safety, welding, horticulture, and health sciences. The Vocational Complex is located about 0.25 miles west of the High School, and students enrolled in the CATE program take classes there for up to two periods a day (*i.e.*, 2 hours) and take the remainder of their classes at the High School.

The CATE program is an attractive academic option for many students. Nearly one-third of the District's high school population (98 students) took at least one CATE class during the 2018-19 school year. These classes expose students to a variety of career opportunities and use clinical, hands-on instruction to teach them marketable skills. Students in health sciences, for example, have worked closely with registered nurses and hosted blood drives alongside donor care specialists. The District's faculty and staff also partner with the East Mississippi Community College to enhance the CATE program and benefit its students.

The Board, however, has allowed Kemper Academy students to reap these same benefits. During the 2018-19 school year, for example, the Board allowed 16 Academy students – white students who were ***not*** enrolled in the District – to take 18 CATE classes. The District is 96 percent black. The Academy is a separate school with a 99 percent white enrollment. Yet the Board taught these Academy students on property it operates, using resources it controls, equipment it owns, curricula it designed, and teachers it pays. The Board allowed these students to benefit from its CATE program with no reimbursement/compensation while they remained enrolled in the virtually all-white Academy.

On December 10, 2021, during a status conference with the Court, the Board stipulated that its past interactions with the Academy have hindered desegregation. The Board also informed the United States and the Court that it has continued to allow Academy students to take CATE classes; it allowed an estimated 20 Academy students to take CATE classes during the first term of the 2021-22 school year. The Court, in turn, issued an oral order directing the Board to stop allowing Kemper Academy students to take the District's career and technical classes by noon on December 10, 2021. The parties sought, and the Court approved, a stay of that oral order to allow those students to complete their coursework through the end of the Fall school term, which ended on December 22, 2021. *See* ECF Amended Text-Only Order (Dec. 16, 2021).

## II. LEGAL STANDARD

As this Court previously noted, school districts that have not been declared fully unitary "have an emphatic duty and responsibility to assure that their relationships or undertakings with private parties in no respect encourage, aid, facilitate, or result in the establishment or operation of private segregated schools." *U.S. v. State of Miss*. 499 F.2d 425, 428 (5th Cir. 1974); *see* Order Granting Interim Relief (ECF No. 6) at 5-6. It is "axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish," so the Board may not provide any tangible aid that supports racial discrimination. *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (quoting *Lee v. Macon Cty. Sch. Bd. of Educ*., 267 F. Supp 458, 476 (M.D. Ala. 1967)); *see also Gilmore v. City of Montgomery, Ala*., 417 U.S. 556, 568 (1974). Thus, the District violated its legal duty by aiding and supporting the Academy when it first opened.

While this Court does not have jurisdiction over the Academy, the Court has jurisdiction over the Board. It may scrutinize "every facet of school operations" to ensure the "vestiges of *de jure* segregation had been eliminated as far as practicable," and it may take steps to preserve the

integrity of the desegregation process and ensure external parties do not impede the District's desegregation efforts.[6] *Bd. of Educ. v. Dowell*, 498 U.S. 237, 250 (1991) (quoting *Green*, 391 U.S. at 435); *cf. Berry v. Sch. Dist. of City of Benton Harbor*, 56 F. Supp. 2d 866 (W.D. Mich. 1999); *Cleveland et al. v. Union Parish Sch. Bd.*, 570 F. Supp. 2d 858, 870 (W.D. La. 2008); *see also Smith v. Bd. of Concordia Parish*, 906 F.3d 327, 331 (5th Cir. 2018). The Court may order full transparency from the Board concerning its interactions with third parties, particularly in light of the District's earlier violations. The Court also may block the Board from taking any actions that interfere with its desegregation obligations. Thus, the Court may restrict the Board from giving any support or aid to the Academy and its students, and require prospective reporting about future interactions between the Board and third parties.

The Court also has power over the Board's school consolidation plan. "The construction of new schools and the closing of old ones are two of the most important functions of local school authorities," and such decisions implicate directly a district's desegregation obligations. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 21 (1971). "We cannot tolerate resegregation of a former dual school system, and the School Board of such a system must demonstrate that the new construction will not tend to promote such a relapse." *Anderson v. Canton Mun. Separate Sch. Dist.*, 232 F.3d 450, 453 (5th Cir. 2000) (internal quotes omitted)); *see also Swann*, 402 U.S. at 21. Thus, this Court has monitored school consolidations since the inception of this case, and all sales, leases, or other transfers of school property are subject to Court approval. *See* Consent Decree (Feb 15, 1989) at 4; *see also* Order (May 26, 1967) at 8; *U.S. v. Hinds Cnty. Sch. Bd.*, 433 F.2d 611, App. B (5th Cir. 1970). Moving forward, the Board must take steps to further desegregation and eliminate the effects of the dual school system, and

---

[6] If a district court is asked to authorize a new charter school, for example, it may examine whether the proposed school would undermine the ongoing desegregation order and may impose conditions on the school's operation if necessary. *See Smith v. Bd. of Concordia Parish*, 906 F.3d 327, 331 (5th Cir. 2018).

this "duty to desegregate [will be] violated if [the] [B]oard fails to consider or include the objective of desegregation in decisions regarding the construction and abandonment of school facilities." *Harris v. Crenshaw Cnty. Bd. of Educ*., 968 F.2d 1090, 1095 (11th Cir. 1992).

## III. STIPULATED REMEDIAL MEASURES

It is therefore **ORDERED** that:

A. The Joint Motion to Approve School Construction and End Support of Private Academy is **GRANTED**.

B. **School Construction and Consolidation**

1. The Board is authorized to construct the "New School" in Dekalb.[7] The Board is currently seeking a suitable parcel of land on which to construct the New School, and will file a notice with the Court at least 30 days prior to finalizing any contract for the purchase of such land.

2. The Board will file a report to the Court by June 1, 2022, containing information about the New School's construction, and similar supplemental status reports on January 16 and June 1, 2023. The New School is expected to open in August 2023, and should have 20 classrooms and a capacity of 320. These status reports should:

    a. Summarize the progress of the construction.

    b. Describe any delays that may prevent the Board from opening the facility by August 2023 and what steps the Board has taken or will take to mitigate the delay(s).

    c. Report on any changes to the proposed building plans (*i.e.*, classroom count, room usage, capacity).

[7] For the purposes of this Order, the new building will be referred to as "New School," with the expectation that the new facility will inherit the name "Kemper County Upper Elementary School." If the Board intends to use a different designation, it must include the new name in its comprehensive school utilization and consolidation plan. *See infra* at III.B.3.

d. Include a timeline of all relevant prospective deadlines and any additional information the Court should know about the construct.

3. The Board will file a comprehensive school utilization and consolidation plan for the Court's review and approval by no later than August 1, 2022. The Board intends to vacate the old Upper Elementary School facility when the New School opens and assign all of its grade K-2 students to Lower Elementary School and all of its grade 3-6 students to the New School. The Board's consolidation plan should include:

a. The proposed grade configurations and feeder patterns for the District's schools starting in August 2023 and, if relevant, a map of the relevant attendance zones.

b. The project student enrollments for the 2023-24 school year, by school, grade, and race, based on the District's May 2022 enrolment data and any other relevant and reliable information.

c. The number of faculty, by race, to be assigned to each school for the 2023-24 school year.

d. The number of staff, by position/title and race, to be assigned to each school for the 2023-24 school year.

e. The Board's plan to publicize and promote the opening of the New School and the CATE program. This campaign should be designed to disseminate timely and accurate information to parents and community stakeholders, and should be targeted toward students who are not enrolled in the District. It also should include information about the District's student registration process.

f. A timeline of all relevant prospective deadlines, and any additional information the Court should know about the consolidation process and prospective student, faculty, and staff assignments.

4. The Board's consolidation plan (*see supra* at III.B.3.) must state how the Board proposes to use the old Upper Elementary School facility and resources. The Board will not use this facility for classroom instructional purposes after August 2023, the property may not be sold or leased without this Court's approval, and the Board must indicate how it intends to ensure that any person/group that uses the property for any purpose in the future will do so in a nondiscriminatory manner. The Board also must describe how it plans to inventory Upper Elementary School's property and equipment, and state what it intends to do with these resources, identifying what (if any) resources the Board plans to move from the old Upper Elementary School facility to the New School.

C. **Support for Kemper Academy**

1. Without prior approval from the Court, the Board shall not provide any support to Kemper Academy or to any person or entity acting on behalf of the Academy, its students, faculty, or staff, except as required by the Individuals with Disabilities Education Act (IDEA) or related laws and regulations, *see, e.g.* 34 CFR 300.130-148; Miss. Code Ann. §§ 37-23-63 *et. seq.*; §§ 37-181-1 *et. seq*. (Equal Opportunity for Students with Special Needs Program); §§ 37-175-1 *et. seq*. (Scholarship for Students with Disabilities Program); §§ 37-173-1 *et. seq*. (Dyslexia Therapy Scholarship for Students). The Board will violate this Order by:

a. Selling, leasing, or otherwise granting to the Academy any land or real estate, including any 16th Section Lands and facilities the District owns or manages.

b. Selling, leasing, or otherwise granting to the Academy any property or tangible resources, including vehicles (*e.g.*, buses), equipment (*e.g.*, computers, athletic apparatuses, instruments), furniture/fixtures (*e.g.*, desks, chairs, chalk- or smart-boards), or instructional material (*e.g.*, books, software).

c. Giving, transferring, or otherwise directing any money or funds to the Academy, except as required by the IDEA or other related laws and regulations, *see, e.g.,* 34 CFR 300.130-148.

d. Authorizing any District employee, including any teacher, staff, or administrator, to aid or support the Academy during regular school hours, except as required to serve parentally-placed private school children with disabilities under the IDEA, *see* 4 CFR 300.130-148.

e. Allowing Academy students to enroll in the CATE program at the Vocational Complex or to take any other classes that use District facilities, staff, or resources.

2. The Board will file a report to the Court by no later than June 1, 2022, and annually thereafter, that:

a. Describes all interactions the District has with Kemper Academy, its students, faculty, or staff, during the preceding year.

b. Lists all tangible, non-monetary, aid a District employee or contractor provided to the Academy or its students during the preceding year,

indicating for each service: (i) the type of aid (*e.g*., special education assessment); (ii) the name of the person who provided the aid; (iii) the date of service; and (iv) the reason or legal mandate (*i.e*., IDEA regulation) for providing the service.[8]

c. Accounts for all funding or financial aid the District provided to the Academy or its students during the preceding year, indicating for each expenditure: (i) the amount; (ii) the name of the person who approved the expenditure; (iii) the date of the expenditure; and (iv) the reason or legal mandate (*i.e*., IDEA regulation) for providing the aid or a reference to the relevant service, *see supra* at III.C.2.b.

D. **Future Sale or Lease of Property**

1. Without prior approval from the Court, the Board will not sell, lease, or otherwise transfer any District land or real estate, including any 16th Section Land the Board manages.

2. Without prior approval from the Court, the Board will not sell, lease, or otherwise transfer any property or tangible resources that has a fair market value that exceeds $1,000.

## IV. CONTINUING JURISDICTION

The Board operated a segregated school system and is under a "continuing duty to eradicate the effects of that system." *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526 (1979); *see also Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 459 (1979) ("Each instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment."). Because the

[8] The Board should comply with the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, and take steps to protect education records that contain personally identifiable information, although such records may be provided to undersigned counsel in a non-public manner. *See* 34 C.F.R. § 99.31(a)(3).

Board violated its affirmative desegregation obligations, the Court will retain jurisdiction over this case for at least five (5) years, until June 1, 2027, to monitor the Board's efforts to comply with this Order and achieve full unitary status. The Court will continue to monitor "every facet of school operations," including student assignment (both between and within schools), faculty assignment, staff assignment, transportation, extra-curricular activities, and facilities. *Dowell*, 498 U.S. at 250 (quoting *Green*, 391 U.S. at 435); *see also Swann*, 402 U.S. at 18 ("existing policy and practice with regard to faculty, staff, transportation, extra-curricular activities, and facilities" are "among the most important indicia of a segregated system").

The United States and the Board have committed to negotiate in good faith any disputes that may arise concerning this case, but both parties have the right to seek judicial review of any compliance issue. The Board must preserve all documents used to prepare the reports described in this Order and all other relevant records, the United States has the right to inspect all records related to the Board's desegregation obligations, and the parties will cooperate to exchange such information. The United States retains the right to speak directly with District employees who are not administrators. The United States also may conduct an on-site review of the District's schools to evaluate the Board's compliance efforts after giving reasonable notice and consulting with the District's counsel, to minimize any disruption to the education process in the schools.

At the end of the five-year monitoring period, on or after June 1, 2027, the Board may file a motion for a declaration of full unitary status and dismissal of this case, provided there are no outstanding disputes pending before the Court concerning the Board's compliance with this Order or its existing desegregation obligations.

## V. CONCLUSION

Taken together, the actions required by this Order will not impede, and should further, desegregation of the District by making it more attractive to white students who are not currently

enrolled in the District but want to benefit from the New School facility, take advantage of the Vocational Complex, or enroll in the CATE program.

All prior orders of this Court remain in full force and effect except as modified herein or by subsequent orders.

**SO ORDERED** this **19th** day of January, 2022.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE